UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

CRIMINAL NO. 3:05CR286-MU

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | **Government's Sentencing** |
| ) | **Memorandum** |
| DAVID LEE PRUETT ) | |
| ) | |
| Defendant. ) | |
| ) | |

NOW COMES the United States of America, by and through Gretchen C. F. Shappert, United States Attorney for the Western District of North Carolina, who files this Sentencing Memorandum in response to Defendant's Sentencing Memorandum in Support of Variance From Sentencing Guidelines, filed on June 5, 2006. This Memorandum does not address all of the arguments raised in the Defendant's Memorandum. In particular, the government agrees with the legal standards cited in the Defendant's Memorandum, but opposes the requested variance. For background, the government refers the Court to paragraphs 6 to 13 of the Presentence Report.

I. DISCUSSION

   A. **The Defendant Did Not "Quit" His Involvement in the Activities of the Group "Legends Never Die" After the "Drink or Die" Group Was Dismantled.**

In support of his request for a variance in this matter, the defendant claims that he "quit" his involvement in the activities of the group "Legends Never Die" (LND) after the crackdown on the warez group "Drink Or Die"(DOD), which took place in December of 2001. However,

ample evidence suggests that the defendant continued to participate in LND's release of software after the DOD group was dismantled.

During the course of the investigation of this case, the FBI obtained the transfer logs to an FTP site that was used as LND's private "drop" site. This meant that the site was not open to other warez groups, but was used by LND in part to shuttle software back and forth between members during the process of supply, cracking, testing, and release. The logs covered the period of time between May 9, 2003 and April 2, 2004. Attachment 1 is a table of the defendant's transfers into and out of LND's private server. These transfers strongly suggest the defendant's active and ongoing involvement during this time frame. First, the fact that the defendant's activity occurred on LND's private "drop" site demonstrates continued membership in the group. Second, the type of activity shows the defendant's involvement in the release process. The defendant uploaded files to "supply" folders, consistent with supplying software to be cracked. He also downloaded files from "to test" folders, consistent with his admitted role as a crack tester. The defendant also downloaded from "to release" folders, suggesting involvement in the distribution of pirated software that had been successfully cracked and tested.

The software *Cimatron IT version 13.1* provides a good example of the defendant's continuing involvement in the scheme. On June 2, 2003, the defendant uploaded this software to a "supply" folder in the LND site. When he did so, the software was not tagged with the "LND" label, indicating that it had not yet been cracked and tested. Two days later, the defendant downloaded the "nfo" file that would provide subsequent downloaders with useful information about the cracked software, and would credit the group that cracked and released it. *See, e.g.*,

Attachment 2 (nfo file for a version of GibbsCam). On July 11, 2003, the defendant downloaded a copy of the software, then labeled "LND" from the "to release" folder.

Another example of the defendant's continuing involvement is his transfer of *GibbsCam 2004 version 7* software. On December 31, 2003, the defendant uploaded this software to a "supply" folder on LND. On February 3, 2004, he downloaded a slightly updated version from the "to test" folder. That same month, LND released the software to the warez scene. *See* Attachment 2 (GibbsCam 2004 v.7 nfo file). Again, this activity demonstrates the defendant's participation in the release process.

Even if the defendant had scaled back on the level of his activity in the group, he continued to support it in the moments after he learned that the FBI was executing a search warrant at his home on April 21, 2004. As described in the Presentence Report, the defendant's residence was searched as part of an international takedown directed at approximately 120 sites in 11 countries. The defendant was at work when the agents commenced the search at his residence. While at work, he was logged onto an Internet Relay Chat (IRC) channel commonly used by the group LND. During the chat session, word began to spread that members of the group Fairlight (FLT) had been "busted" in the Netherlands. One participant observed that no one in LND was also a member of FLT, but that LND's FTP sites were being taken offline as a precaution. A short time later, the defendant advised the entire group that he had been "busted by the fbi. this is no joke. act accordingly." He recommended that others format their hard drives, a process that would delete all of the content in their computers.

After warning others and encouraging them to delete incriminating evidence, the defendant did cooperate with the FBI. He drove to the FBI office and submitted to an interview.

He admitted to involvement in the warez scene, but claimed it had decreased dramatically since members of the group "Drink or Die" had been raided (December of 2001). He admitted that he used to test cracked software, and then upload the software and make it available for distribution. The defendant denied being a member of any warez group.

B. **Comparison to Other Sentences in Operation Fastlink**

The defendant submitted a newspaper article regarding the sentencing of three other defendants charged with criminal copyright infringement. The sentences were imposed in the Eastern District of Virginia. Government counsel is personally familiar with those cases because they were prosecuted by an office colleague. The defendant cites to the short prison terms imposed in the three cases to support his contention that this Court should impose a sentence below the agreed-upon guideline range.

As the defendant correctly notes, the three Virginia cases were part of "Operation Fastlink," which has been accurately termed the largest multinational law enforcement action against online piracy. The search of the defendant's residence was part of the same operation, as described in paragraph 9 of the Presentence Report. As that paragraph notes, there were actually four undercover operations that were combined in the simultaneous law enforcement action. And as the defendant's newspaper article correctly notes, the three Virginia defendants were charged primarily with *music* piracy. This resulted in a significant difference in their sentencing guideline calculation.

Fortunately for the Virginia defendants, they chose to infringe primarily copyrighted music, which generally has a retail price of less than $20 a CD. Unfortunately for the defendant and members of LND, they chose to infringe sophisticated technical software that generally has a

4

retail price of thousands of dollars per title. The "infringement amount " in the instant case is accordingly much higher than in the Virginia cases. Based upon the agreed-upon "infringement amount" in the Virginia cases, the defendant receiving a 15-month prison term had a guideline range of 15 to 21 months. The Court imposed a sentence within the guideline range. The defendant receiving a split sentence of six months in prison and six months home confinement had a sentencing guideline range of 12 to 18 months. The Court imposed a sentence within the guideline range. The defendant receiving a sentence of 10 months home confinement had a guideline range of 10 to 16 months (Zone C). The Court's sentence was a downward departure because the guidelines would have required that at least half of the 10-month term be served by imprisonment. U.S.S.G. §5C1.1(d)(2).[1]

Based upon the difference in infringement amounts, imposing a similar sentence in this case would be inconsistent with the sentences imposed in the Virginia cases. Such a sentence would in fact create a disparity, and disregard the principle that infringement amount is the primary measurement of culpability under U.S.S.G. §2B5.3.

C. <u>**The Defendant's Motive**</u>

The defendant claims that he never sold any of the software pirated by his group, nor sought to profit by his activity. The government has no evidence to the contrary, and agrees that this is generally a mitigating sentencing factor. However, this fact does not justify a downward departure or variance, in part because Congress and the Sentencing Commission specifically addressed this factor. In addition, as the defendant has conceded, he benefitted from his

---

[1] The judgments in each of the Virginia cases are public record.

5

Case 3:05-cr-00286-GCM-CH     Document 21     Filed 06/22/06     Page 5 of 8

involvement in this activity by gaining access to a virtually unlimited supply of pirated digital movies, music, games and software.

The statutes governing criminal copyright infringement were substantially amended in 1997 by the No Electronic Theft ("NET") Act, Pub. L. No. 105-47 (1997). The NET Act criminalized certain copyright infringement even if committed with no intention of commercial advantage or private financial gain. 17 U.S.C. 506(a)(1)(2004); 18 U.S.C. § 2319(c)(2004). These amendments reflect Congressional recognition that the Internet provides a platform for large-scale electronic piracy that has a substantial market impact, even where the infringer has no profit motive. *See* H.R. Rep. No. 105-339, at 4 (1997). The Sentencing Guidelines were also amended as a result of the NET Act. In particular, the Guidelines provide for a 2-level *reduction* where the offense was not committed for commercial advantage or private financial gain. U.S.S.G. § 2B5.3(b)(4). However, the definition of "commercial advantage or private financial gain" includes the expectation of the receipt of other "protected works." *Id.*, Application Note 1.

The defendant expected to and did receive other protected works. Like all members of the warez scene, he enjoyed and took advantage of his access to pirated movies, music, games and software. Long after he claims to have quit the warez scene, the defendant's downloads continued. In the last three months before his home was searched, the defendant downloaded more than 25 different titles of software, music, and movies.

Finally, the warez scene provides the raw materials for the "for profit" infringers. The website www.softcracks.org offers cracked software for a price. Searching the website for "LND" will reveal numerous titles released by the defendant's group, including GibbsCam 2004 v.7.0, uploaded by the defendant to LND's "supply" folder on December 31, 2003.

6

## II. CONCLUSION

For the reasons stated herein, the United States respectfully requests that the Court deny the defendant's motion for a variance in this case.

Respectfully submitted this the 22nd day of June, 2006.

> GRETCHEN C.F. SHAPPERT
> United States Attorney
>
> s/ Corey F. Ellis
>
> COREY F. ELLIS
> Assistant United States Attorney
> N.C. Bar No. 21670
> 100 Otis Street
> Asheville, NC 28801
> Telephone: 828-271-4661
> Fax: 828-271-4670
> E-mail: Corey.Ellis@usdoj.gov

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 22nd day of June, 2006, the foregoing document was electronically served upon Defendant at the following addresses:

deke@barnettfalls.com

      GRETCHEN C.F. SHAPPERT
      United States Attorney

      s/ Corey F. Ellis

      COREY F. ELLIS
      Assistant United States Attorney
      N.C. Bar No. 21670
      100 Otis Street
      Asheville, NC 28801
      Telephone: 828-271-4661
      Fax: 828-271-4670
      E-mail: Corey.Ellis@usdoj.gov